ROSE MARIE REIFSCHNEIDER, APPELLANT AND CROSS-APPELLEE, V.
NEBRASKA METHODIST HOSPITAL, APPELLEE AND
CROSS-APPELLANT.
447 N.W.2d 622

Filed November 3, 1989.    No. 87-1069.

Michael G. Goodman, of Matthews & Cannon, P.C., for appellant.

Robert M. Slovek, of Sodoro, Daly & Sodoro, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, J.

The plaintiff, Rose Marie Reifschneider, commenced this action on May 1, 1980, to recover damages for the injuries she sustained on April 4, 1977, which she alleged were caused by the negligence of the defendant, Nebraska Methodist Hospital (Methodist). In *Reifschneider v. Nebraska Methodist Hosp.*, 222 Neb. 782, 387 N.W.2d 486 (1986), this court reversed the order of the district court sustaining Methodist's motion for summary judgment and remanded the cause for further proceedings.

The plaintiff's third amended petition, filed April 7, 1987, alleged that she had been injured on April 4, 1977, as the result of the malpractice and negligence of Methodist's employees; that in order to induce plaintiff to forgo filing suit for malpractice and negligence, Methodist's agent agreed to pay all of the expenses which plaintiff might incur as a result of the April 4 accident; that plaintiff relied on this promise and "forewent the filing of such suit"; that Methodist paid all expenses from April 1977 through July 1978, but referred plaintiff to Methodist's insurance carrier at that time; that during subsequent settlement negotiations with Methodist and its insurer, plaintiff's father was assured that plaintiff's medical

bills would be paid as agreed; that because of the conduct of Methodist and its agents, plaintiff and her father "were lulled into a sense of security and belief that plaintiff's expenses would always be taken care of, and that it was appropriate for her, therefore, to trust the defendant and forego the filing of suit for malpractice as she had agreed"; and that "defendant's failure to comply with its promise after the defendant had changed its position to her detriment estops it from claiming the running of the statute of limitations in this case."

In its answer, Methodist affirmatively alleged the statute of limitations as a defense and disputed the facts of any estoppel claimed by the plaintiff. Methodist also affirmatively alleged that neither it nor its agents were negligent.

On the defendant's motion, the trial was bifurcated pursuant to Neb. Rev. Stat. § 25-221 (Reissue 1985) to determine the issues related to Methodist's statute of limitations affirmative defense. Apparently, the parties are in agreement that the applicable statute of limitations is Neb. Rev. Stat. § 44-2828 (Reissue 1988), which provides that any action to recover damages based on malpractice or professional negligence shall be commenced within 2 years next after the act or omission providing the basis for such action.

The plaintiff's request for a jury trial on the statute of limitations issue was denied. After a trial to the court without a jury, the court found the statute of limitations ran on April 4, 1979, and dismissed the plaintiff's third amended petition. The plaintiff has appealed, contending the court erred in finding she was not entitled to a jury trial on the statute of limitations issue. Methodist has cross-appealed, claiming the district court erred in failing to sustain its motion for a directed verdict.

The record shows that the plaintiff was injured when she fell from an unattended hospital cart in the emergency room at Methodist on April 4, 1977. The plaintiff's father, Jacob Reifschneider, was a member of the hospital board of trustees on the date in question and acted as plaintiff's agent throughout the attempted resolution of the matter. Jacob Reifschneider was also a trustee for the Eppley Foundation, which had provided grants to Methodist.

The plaintiff concluded that Methodist was responsible for

her injuries and considered filing suit against Methodist as early as April 1977. On April 8, Jacob Reifschneider contacted an attorney who, in turn, referred him to attorney Richard Fellman, who agreed to handle the case. Fellman's letter of April 15, 1977, to John Estabrook, the president of Methodist, made claim for the plaintiff's injuries and damages and advised Estabrook that he had instructions to proceed, if necessary, with litigation.

Jacob Reifschneider met with Estabrook on April 16, 1977. During this meeting Jacob Reifschneider and Estabrook agreed that Methodist would pay the plaintiff's medical expenses arising from the April 4 accident. Estabrook testified that he agreed to pay the expenses for a short period of time and advised Jacob Reifschneider to file a claim with Methodist's insurance company. Although there was no dollar limit on the agreement, Estabrook testified that he and Reifschneider believed the matter would be cleared up within 6 months. Jacob Reifschneider testified by deposition that there was no time limit on the agreement. Jacob Reifschneider and Estabrook did agree during the April 16 meeting that a lawsuit against Methodist would not be filed if Methodist would pay the plaintiff's medical expenses. Fellman was discharged on April 18, 1977.

Pursuant to the agreement, Methodist absorbed its own costs for the plaintiff's treatment and paid the plaintiff's doctor bills. Methodist also paid all expenses associated with four trips which the plaintiff made to the Mayo Clinic in July, August, and October 1977, and May 1978.

In July 1978, Methodist stopped paying the doctor bills and began billing the plaintiff directly for her hospital expenses. Estabrook testified that in July 1978 he advised Reifschneider to contact Methodist's insurance agent, Harry Koch, and file a claim with Methodist's insurance company.

On September 20, 1978, the plaintiff and her father met with Dennis Donner, a claims representative for The St. Paul Fire and Marine Insurance Company (St. Paul), Methodist's insurer, to discuss the merits of the plaintiff's claim and the statute of limitations issue. Donner investigated the claim and on September 28, 1978, wrote a memorandum to the plaintiff

advising her that the statute of limitations was 2 years under the Nebraska Hospital-Medical Liability Act. The plaintiff was represented by attorney Ray Simon on this date.

During the fall of 1978, the plaintiff, her father, and attorneys Ray Simon and John Miller met to discuss investigating a malpractice claim against Methodist. The plaintiff testified that she retained Miller in October 1978. On October 27, 1978, the plaintiff signed an authorization for Simon and Miller to examine her medical records. The purpose of the authorization was to assist her attorneys in preparing a case against Methodist "if . . . need be." The plaintiff testified that at the time she hired Miller, she personally believed that Methodist would not settle the claim and that she probably would have to sue Methodist to get satisfaction.

Jacob Reifschneider continued to negotiate with St. Paul's agent Koch and Estabrook regarding settlement of the claim. He met with Koch and Estabrook on January 31, 1979, to discuss a $250,000 settlement. Jacob Reifschneider's notes of this meeting indicate that Simon urged the plaintiff to proceed with litigation. Jacob Reifschneider, however, did not want to litigate.

On February 28, 1979, Donner wrote a letter to the plaintiff stating, "It is our conclusion that there is no liability on the part of [Methodist] and I will be unable to offer settlement." Donner was willing to offer $5,000 to close St. Paul's file and avoid litigation. The plaintiff testified she understood Donner's letter to mean that St. Paul would not settle and that St. Paul was Methodist's insurance carrier. She was represented by Miller on this date.

Notwithstanding St. Paul's denial of liability, settlement negotiations continued because of Reifschneider's longstanding relationship with Methodist and his position with the Eppley Foundation. Koch advised Jacob Reifschneider on March 5, 1979, that St. Paul would not settle, but on March 28, Koch proposed that St. Paul and Methodist establish a $25,000 escrow fund to pay the plaintiff's expenses for a 10-year period. Koch testified, however, that he never recommended to plaintiff that she should not file suit.

Even though no lawsuit had been filed by April 4, 1979,

Koch and Estabrook continued to discuss settlement options with Jacob Reifschneider. On April 28, 1979, Jacob Reifschneider declined the $25,000 settlement offer. Apparently, the offer remained open, but on June 20, 1979, plaintiff herself returned a $12,500 check to Estabrook and demanded $250,000. As of August 8, 1979, the $25,000 offer still remained open. Present counsel were retained in August 1979. This action was filed on May 1, 1980.

The sole issue on the appeal is whether equitable estoppel, or estoppel in pais, applies in this case.

"[T]he equitable doctrine of estoppel in pais may, in a proper case, be applied to prevent a fraudulent or inequitable resort to a statute of limitations and a defendant may, by his representations, promises, or conduct be so estopped where the other elements of estoppel are present." *State Farm Mut. Auto. Ins. Co. v. Budd*, 185 Neb. 343, 346, 175 N.W.2d 621, 623-24 (1970); *Luther v. Sohl*, 186 Neb. 119, 181 N.W.2d 268 (1970). Equitable estoppels rest largely on the facts and circumstances of the particular case. *Luther v. Sohl, supra*; *Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (1988). Generally, if a plaintiff has ample time to institute an action after the inducement of delay has ceased to operate, he or she cannot excuse the failure to act within the statutory time on the ground of estoppel. *Luther v. Sohl, supra*; *MacMillen v. A. H. Robins Co.*, 217 Neb. 338, 348 N.W.2d 869 (1984); *Seagren v. Peterson*, 225 Neb. 747, 407 N.W.2d 790 (1987).

In *Luther v. Sohl, supra*, the plaintiff was injured on December 14, 1964, while assisting the defendant in repairing a roof. Both the plaintiff and defendant were insured by Farm Bureau Insurance Company. Plaintiff was aware on the date of his injury that the statute of limitations was 4 years and that it would run on December 14, 1968. In January 1967, the plaintiff contacted Farm Bureau in an attempt to settle his claim. A Farm Bureau agent visited the plaintiff at his home on November 1, 1967, to obtain medical releases. On June 13, 1968, the plaintiff expressed concern to the Farm Bureau agent about the statute of limitations. The agent told the plaintiff that as long as they were still negotiating he need not worry. The agent then made a specific settlement offer which was refused.

On July 10, 1968, the Farm Bureau agent reiterated the offer of June 13 and advised the plaintiff and his wife that it was the final amount the company would offer. Plaintiff again refused the offer, and the agent stated that he would attempt to get more. On July 18, 1968, the agent notified the plaintiff that Farm Bureau would not offer a higher settlement. The plaintiff had no further negotiations with Farm Bureau after July 18, 1968. Both the plaintiff and his wife testified that they believed Farm Bureau ceased negotiating in July 1968. Under these circumstances, we held that the defendant was not estopped from raising the statute of limitations as a defense in the plaintiff's action for personal injuries.

> [T]he evidence is clear that the only possible inducement for delay was a representation that as long as they were negotiating the plaintiff need not worry about the statute of limitations. That representation was made June 13, 1968. It is also clear that the last negotiations were on July 18, 1968, and plaintiff at that time "supposed" the insurance company had ceased negotiating. Almost 5 months went by after that before the bar of the statute finally fell.

*Id.* at 122, 181 N.W.2d at 270.

In *Seagren v. Peterson, supra,* the plaintiff was damaged because of the defendant attorney's failure to file an estate tax return on May 1, 1980. The default was not discovered until June 1983, and the plaintiff had until June 1984 to file an action, pursuant to Neb. Rev. Stat. § 25-222 (Reissue 1985). The lawsuit was not filed until January 28, 1985, and the defendant's motion for summary judgment was sustained because the action was barred by the statute of limitations. On appeal, the plaintiff claimed that his failure to comply with the statute of limitations should be excused on the ground of estoppel because the defendant assured him several times that he would take care of any interest and penalties resulting from the failure to file the tax return. This court determined that estoppel did not apply to the facts of the case:

> [I]t became quite apparent by the time [defendant] withdrew from the case in June of 1983 and plaintiff had engaged other counsel that [defendant] was not going to

make good on his promise. Seven more months went by before the estate tax return was filed, in the latter part of January 1984, and the amount of tax was determined and presumably paid. Plaintiff therefore had approximately an additional 5 months within which to file his action under the 1-year extended limitation.

225 Neb. at 750, 407 N.W.2d at 792-93.

The plaintiff relies on *State Farm Mut. Auto. Ins. Co. v. Budd*, 185 Neb. 343, 175 N.W.2d 621 (1970), in which we held that the defendant was estopped from raising the statute of limitations as a defense to the plaintiff's personal injury claim. In that case, State Farm's insured, Sam Garafalo, was involved in an automobile accident with defendant William Budd on December 26, 1961. State Farm paid Garafalo the amount of the damages to his automobile and was subrogated to his claim against Budd in the sum of $1,650. Budd was insured by Aetna Casualty & Surety Company.

State Farm notified Aetna of its subrogation claim. On March 31, 1962, Aetna replied that the subrogation claim would be considered upon conclusion of the personal injury claim arising out of the accident. On 14 separate occasions between April 16, 1962, and October 21, 1965, Aetna informed State Farm that its file was still open and that it would consider the subrogation claim after the bodily injury claim was settled. On February 8, 1966, Aetna notified State Farm that the statute of limitations had run and rejected the subrogation claim.

Under those circumstances, the court stated:

"One cannot justly or equitably lull his adversary into a false sense of security, and thereby cause him to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his conduct as a defense to the action when brought." [Citations omitted.]

In the present case, defendant's insurer on three occasions assured plaintiff it would "honor" plaintiff's claim and concedes it was liable for the full amount of the claim. Having convinced plaintiff that its claim would be honored or paid, it was not difficult to secure multiple extensions of time until the statute of limitations had run

against the claim. In reliance on Aetna's assurances, plaintiff forbore suit. Now defendant seeks to take advantage of his insurer's trickery and dishonesty to defeat plaintiff's just claim. To permit him to do so would be contrary to equity, morality, justice, and good conscience. We find that defendant should be held to the position previously assumed by his insurer and should be required to "honor" plaintiff's claim.

*Id.* at 347-48, 175 N.W.2d at 624.

In the present case, it is uncontroverted that the plaintiff did not file suit until more than 3 years after she was injured. The plaintiff does not claim that the 2-year statute of limitations set forth in § 44-2828 is inapplicable to her claim or that her cause of action falls within the discovery exception to that statute. The only issue with respect to the statute of limitations is whether the defendant was estopped from pleading the statute of limitations because of its alleged representations to the plaintiff. On this issue, the plaintiff alleged that she and her father "were lulled into a sense of security and belief that plaintiff's expenses would always be taken care of" during settlement negotiations with the defendant.

The elements of equitable estoppel are,

as to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice. [Citations omitted.]

*Jennings v. Dunning,* 232 Neb. 366, 371, 440 N.W.2d 671, 675 (1989). See, also, *Sevier v. School Dist. HC 1, ante* p. 293, 444

N.W.2d 897 (1989).

The plaintiff testified that she believed that the defendant was responsible for her injuries dating from April 1977. She considered filing suit in April 1977, but agreed not to do so based on Methodist's promise that it would pay her medical expenses associated with the April 4, 1977, accident. In July 1978, however, her father was notified that Methodist would no longer pay these expenses and was advised to file an insurance claim. Methodist made no payments after July 1978. In September 1978, Methodist's insurer advised plaintiff that the statute of limitations on the claim was 2 years. In October 1978, approximately 6 months before the statute of limitations ran, the plaintiff determined that she would sue Methodist if she did not get satisfaction and believed that she would not get a satisfactory settlement from Methodist unless she filed suit. Plaintiff was represented by counsel when she was informed by the insurance company that the statute of limitations was 2 years, and when her insurance claim was denied on February 28, 1979.

The plaintiff herself testified that she was not induced to forgo filing suit by Methodist's alleged agreement to pay her medical bills:

Q. Did any representative of the hospital or the insurance company tell you that in exchange for your cooperation that a settlement would be guaranteed for you?

A. No.

Q. Did they even tell you that it was possible, likely?

A. No. They were just reviewing for the hospital.

Q. So as you understood it there were no guarantees of settlement?

A. There was never any guarantee to my knowledge or stated to me.

The facts that the plaintiff knew of the applicable statute of limitations, was represented by attorneys prior to the statute's running, and believed that she would not receive satisfaction on her claim short of litigation, all were uncontroverted at trial. In order to prevail, the plaintiff was required to demonstrate reliance, in good faith, upon conduct or statements of the

defendant or its agents. The record shows as a matter of law that there were no statements or conduct such as was alleged by the plaintiff or reliance on such by the plaintiff. The evidence was insufficient to create a question of fact on the issue of estoppel.

In the absence of a fact question, we need not decide whether the trial court erred in failing to grant the plaintiff's request for a jury trial. It is unnecessary to consider the cross-appeal.

The judgment of the district court is affirmed.

AFFIRMED.